COMMONWEALTH vs. WILLIAM SMALLWOOD.

Middlesex. November 5, 1979. — March 3, 1980.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Practice, Criminal,* Charge to jury, Conduct of prosecutor, Argument by prosecutor. *Homicide. Constitutional Law,* Admissions and confessions, Assistance of counsel. *Evidence,* Other offense.

In the circumstances, reversal of a murder conviction was not required by the judge's statement to the jury that, regardless of the verdict, the death penalty could not lawfully be imposed in Massachusetts for the crime with which the defendant was charged. [882-883]

Telephone statements to a police officer by a defendant who was not in custody were admissible at the defendant's trial notwithstanding the fact that he had not been given Miranda warnings before making the statements, and the fact that a complaint and an arrest warrant had been issued a few days earlier. [883-885]

There was no error at a criminal trial in the admission of certain statements made by the defendant to his brother in the presence of a police officer while all three were in the officer's automobile after the defendant's surrender. [885-887]

There was no error in the denial of a criminal defendant's motion to dismiss the indictments against him on the ground of prosecutorial misconduct in that a witness was subpoenaed by the government for interview on a day on which the case was not before the court, where the witness refused to answer any questions and where the judge ordered the prosecutor to terminate the improper use of the subpoena. [887-888]

There was no error either in the denial of a criminal defendant's motion to dismiss the indictments against him on the grounds that a witness was subpoened to appear on a nontrial day and that she did appear and answer questions asked by the prosecutor or in the denial of the defendant's motion to suppress the answers the witness gave during the interview, where the affidavit in support of these motions was hearsay, where the judge ordered the prosecutor to cease the improper practice, and where the facts that the subpoena had issued and that the interview had occurred as well as the content of the witness' statement were revealed to the defendant before trial. [888]

At a criminal trial the judge did not abuse his discretion in limiting the defendant's cross-examination of a witness concerning the prosecutor's

misuse of the subpoena where the judge had already permitted the witness to testify on the same subject. [888-889]

At the trial of indictments arising from the robbery of a liquor store by the defendant and an accomplice, the defendant was not entitled to a mistrial based on the prosecutor's alleged introduction of evidence that the defendant had participated in a crime not charged, where the references in question were to use of a gun in an unrelated incident by the defendant's accomplice and where the judge gave curative instructions immediately and at the close of the case. [889-891]

Although certain obscure remarks by the prosecutor at a criminal trial were susceptible of being interpreted as a comment on the defendant's failure to testify, the judge did not abuse his discretion in denying the defendant's motion for a mistrial based on the remarks and relying instead on curative instructions to the jury. [891-893]

INDICTMENTS found and returned in the Superior Court on March 15, 1978.

Pretrial motions to suppress evidence were heard by *Dimond*, J., and the cases were tried before *Simons*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Stephen Hrones* for the defendant.

*Pamela L. Hunt*, Legal Assistant to the District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant brings this appeal under G. L. c. 278, §§ 33A-33G, from his convictions on indictments charging murder in the first degree, armed robbery, and unlawfully carrying a firearm on his person. He was sentenced to a term of life to be served at the Massachusetts Correctional Institution at Walpole on the murder conviction and to additional concurrent terms of life and three to five years on the armed robbery and firearm indictments respectively.

The defendant raises the following issues in this appeal: (1) whether it was error for the judge to instruct the jury that, should the defendant be found guilty, the death penalty was not a possible sentence; (2) whether the judge erred in admitting statements made by the defendant without the

assistance of counsel after a complaint had been obtained and an arrest warrant had been issued; (3) whether the assistant district attorney's use of subpoenas to summon witnesses to the courthouse on days when the case was not before the court denied the defendant a fair trial; (4) whether the judge erred in denying the defendant's motion for mistrial after the assistant district attorney elicited testimony regarding the alleged involvement of the defendant in a crime not charged; and (5) whether statements made by the assistant district attorney in closing argument constituted a prejudicial reference to the defendant's failure to testify and were therefore a violation of the defendant's rights under the Fifth Amendment to the Federal Constitution.

We conclude that there was no error and, further, find no sufficient reason to disturb the verdicts pursuant to our powers under G. L. c. 278, § 33E. Consequently, we affirm the judgments.

We summarize the evidence presented. On December 16, 1977, two armed men robbed Vautour's Liquor Store in Everett. Present in the store throughout the incident were the owner, Willard Vautour, and a customer, Francis Brown. During the course of the robbery another customer, Edward Stevens, entered the store. One of the robbers, who was armed with a .38 caliber hundgun, ordered Stevens to move to the rear of the store. When Stevens failed to comply, the armed robber shot and killed him. The two robbers then fled from the store.

Francis Brown and Willard Vautour, working in cooperation with Detective Nicholas Addonizio of the Everett police department, identified photographs of the defendant as the gunman and William Florentino as his unarmed accomplice. On March 4, 1978, Detective Addonizio filed a complaint and obtained an arrest warrant for the defendant.

Detective Frank O'Halloran of the State police was also involved in the investigation of the crime. He contacted the defendant's brother, James Smallwood, in an attempt to enlist his cooperation in inducing the defendant to surrender. On the evening of March 8, 1978, O'Halloran went

to James Smallwood's house and discussed the advantages to the defendant of surrendering himself. James then made a telephone call to the defendant at an undisclosed location and permitted O'Halloran to speak with him. O'Halloran did not inform the defendant of his rights at this time. He asked the defendant if he had been driving a green car on the night of the crime. The defendant replied that he did not recall. He added that "Boo Boo" (William Florentino) had urged him to go along on the night of the crime and had pressured him to use the gun. O'Halloran directed the conversation toward a discussion of surrender and then returned the telephone to James, who assured his brother that it would be in his best interests to surrender. The defendant agreed to surrender to O'Halloran at a location agreed upon by the defendant and his brother. Prior to trial a motion by the defendant to suppress the telephone conversation was denied.

O'Halloran and James drove to the agreed location where they met the defendant and a young woman, both of whom got into the back seat of the car. Because the defendant was hungry, all four went to a restaurant. After they ate, the young woman was dropped off. A conversation then took place in the car. The defendant's motion to suppress this conversation was denied.

Prior to going to the Newton police station O'Halloran, the defendant and his brother stopped at O'Halloran's home where the defendant was given something to drink, and his clothes were taken to be washed. A conversation which occurred at that time was suppressed by the judge, on the defendant's pretrial motion.

Detective O'Halloran knew that an attorney, Harvey Rowe, was working on behalf of the defendant. His attempts to contact Mr. Rowe prior to the defendant's surrender were unsuccessful. O'Halloran finally reached Mr. Rowe the morning after the surrender, and they agreed that the defendant would not be questioned without his attorney.

Statements made by the defendant in the course of an interrogation by the Everett police department in violation of

this agreement were suppressed at trial. The statements made by the defendant, on the telephone and in person, on the evening of the surrender, were the subject of a pretrial motion to suppress which was denied.

1. At the close of his charge to the jury the judge stated that, regardless of the verdict, the death penalty could not lawfully be imposed in Massachusetts for the crime with which the defendant was charged. Immediately following the jury charge defense counsel objected to the discussion of the consequences of a guilty verdict.

We have long held that the sentencing consequences of a verdict may not be submitted to the jury because the jury's function is to reach a verdict based solely on the evidence presented to them considered in the light of the judge's charge to them concerning the applicable legal standards. *Commonwealth* v. *Ferreira,* 373 Mass. 116 (1977) (reversible error to charge jury that verdict of guilty of murder in first degree would carry sentence of life imprisonment without parole, whereas verdict of guilty of murder in second degree would carry same sentence with eligibility for parole after fifteen years). "In [*Commonwealth* v.] *Mutina,* [366 Mass. 810 (1975)], we reversed a conviction of murder in the first degree, holding that, for all trials and retrials after the date of that opinion, a defendant is entitled to an instruction regarding the consequences of a verdict of not guilty by reason of insanity if a timely request for such instruction is made. We stressed, however, that we did not depart from 'the long-standing general rule that neither sentencing nor parole may appropriately be considered by the jury in reaching their verdict.' We concluded that the jurors might well have based their verdict, not on the evidence, but on a desire to ensure the continued confinement of the defendant. Instructing the jury on the consequences of a verdict of not guilty by reason of insanity may, in an appropriate case, afford the same protection as does the application of the general rule that sentencing consequences are not within the jury's province: it prevents extraneous factors from interfering with or even totally eclipsing the jury's deliberations

with respect to the evidence before them." *Commonwealth v. Ferreira*, 373 Mass. 116, 125-126 (1977).

In the instant case, as in *Mutina*, we reaffirm the general rule against instructing the jury on sentencing and stress that the judge should not have given such an instruction. Nevertheless, under the particular circumstances of this case we do not find that the judge's instruction, however ill-advised, amounted to error of reversible magnitude. Here the judge apparently was concerned that the death penalty question might be an "extraneous factor . . . interfering with . . . the jury's deliberations." *Commonwealth* v. *Ferreira, supra* at 126. He decided that he should clarify for the jury the status of the death penalty, particularly because of extensive news reporting of recent legislative proposals. Thus the judge's instruction was an effort to remove extraneous considerations by clarifying what the sentence would not be. We find the probable effect of this charge to be more closely akin to that of the permissible instruction in *Mutina* than to that of the impermissible *Ferreira* instruction, in which the judge informed the jury of the widely disparate parole consequences of two potential verdicts.

Moreover, in the instant case the judge minimized any untoward influence that this portion of the charge might have had on the jury by stressing that the jury's verdict must "be based solely upon the evidence in this case and without regard to the possible consequences." We do not assume that the jury failed to heed this admonition. *Commonwealth* v. *Fazio*, 375 Mass. 451, 458 (1978). *Commonwealth* v. *Leno*, 374 Mass. 716, 719 (1978). Thus, viewing the impact of the charge as a whole (see *Commonwealth* v. *Godin*, 374 Mass. 120, 130 [1977], cert. denied, 436 U.S. 917 [1978]; *Commonwealth* v. *Scanlon*, 373 Mass. 11, 19 [1977]), we do not find a reversible violation of the rule against instructing the jury on sentencing.

2. The defendant argues that it was error to admit the statements he made to Detective O'Halloran on the telephone and in person without the assistance of counsel on the evening of the surrender. As for the telephone statements,

clearly the defendant was not in custody. Hence, Miranda warnings were not required. *Oregon* v. *Mathiason*, 429 U.S. 492 (1977). *Commonwealth* v. *Haas*, 373 Mass. 545, 551 (1977). The defendant, however, attempts to bring the instant case under the rule of *Massiah* v. *United States*, 377 U.S. 201 (1964), that "once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer* v. *Williams*, 430 U.S. 387, 401 (1977). However, this claim fails because although a complaint and an arrest warrant had been issued prior to the defendant's telephone statements, we conclude that this does not constitute the commencement of "adversary proceedings" in Massachusetts.

The *Brewer* quotation is derived from *Kirby* v. *Illinois*, 406 U.S. 682, 688 (1972), a case which clarifies the reasons for attachment of the right to counsel. *Kirby* indicates that the cases in which the United States Supreme Court has held that the right to counsel had attached all "involved points of time at or after the initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689. *Kirby* stresses that a person is entitled to counsel once the government has "committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Id.* The United States Supreme Court has also explained that a defendant's right to counsel attaches whenever there is a "pretrial procedure that would impair defense on the merits if the accused is required to proceed without counsel." *Gerstein* v. *Pugh*, 420 U.S. 103, 122 (1975). See *United States* v. *Wade*, 388 U.S. 218, 226 (1967) (accused need not stand alone at any stage "where counsel's absence might derogate from the accused's right to a fair trial").

The complaint and arrest warrant procedure in Massachusetts does not amount to an adversary judicial proceed-

ing, nor does anything occur at this stage which could impair a defense. While District Court judges are authorized to receive complaints and issue warrants, G. L. c. 218, § 32, a clerk or assistant clerk may also receive complaints, administer the required oath, and issue warrants in the name of the court. G. L. c. 218, § 33. *Commonwealth* v. *Penta,* 352 Mass. 271, 273 (1967). This is often done in informal fashion and may take place in the clerk's office or the judge's lobby. It would be anomalous to hold that the right to counsel attaches at this stage when indeed a felony suspect has no right to be heard in the preceeding. See G. L. c. 276, § 22 (providing only for appearances by the complainant and his witnesses in warrant procedure). Because the suspect has no right to a hearing and customarily the proceeding is entirely ex parte, it is illogical to posit that counsel is required at this stage to protect the rights of the suspect against any potential abuses of the criminal process. Contrast G. L. c. 218, § 35A (permitting person not under arrest against whom misdemeanor complaint is made opportunity to be heard in opposition, personally or by counsel).

The defendant also contends that it was error to admit the statements he made in Detective O'Halloran's car without benefit of Miranda warnings because they were the result of custodial interrogation. However, because we find that the defendant's statements were not the product of police interrogation, the Miranda warnings were not required and the defendant's unsolicited statements were properly admitted.[1] See *Commonwealth* v. *O'Brien,* 377 Mass. 772, 776 (1979).

Immediately upon entering O'Halloran's car, the defendant said to his brother, "I hope I'm doing the right thing, Jimmy." Clearly this was a spontaneous statement in no way elicited by O'Halloran, who had not yet spoken. The motion judge recognized this and properly ruled the statement admissible.

---

[1] The judge's finding that the defendant's statements were not the product of police interrogation removes the issue of whether the statements were made while the defendant was in police custody.

Subsequently O'Halloran drove to a restaurant. In the restaurant parking lot, O'Halloran asked the defendant whether a green car had been involved in the crime. The defendant replied that he did not recall. O'Halloran then asked the defendant how he had become "so mixed up." The defendant replied that he "was high on Valium and liquor." At the hearing on the defendant's motions to suppress statements, the Commonwealth stipulated that it would not introduce these questions and answers at the trial. We find this to have been a judicious stipulation which properly removed from evidence the only portion of the defendant's statements which were actually the product of interrogation by O'Halloran.[2]

After the four left the restaurant, the defendant's girl-friend was dropped off. Then, without any participation or inducement by O'Halloran, the defendant freely and voluntarily spoke with James. James said, "They know about the whole thing." The defendant asked James, "Has anyone heard from Boo Boo?" James replied that he was in Billerica. At one point, the defendant volunteered to his brother, "It was all Boo Boo's idea."

These statements were properly admitted. By no means were they connected with O'Halloran's questions in the parking lot, either chronologically or in terms of subject matter, sufficiently to be viewed as a product of O'Hallo-

---

[2] It may be argued that the defendant's subsequent conversation with his brother should have been suppressed because it was the product of the defendant's erroneous impression that he had already let the cat out of the bag in his parking lot conversation with O'Halloran. See *Commonwealth v. Haas*, 373 Mass. 545, 554 (1977). However, even if we were to hold that the "cat out of the bag" analysis applies when the earlier statement is not coerced, see *Commonwealth v. Watkins*, 375 Mass. 472, 481 (1978), but is merely elicited without Miranda warnings, the rule cannot logically be applied in this situation. No cat remained in the bag at the time of the parking lot conversation because the defendant's earlier admissions to O'Halloran on the telephone were far more extensive, specific, and inculpatory than his statement in the parking lot. Therefore, if the metaphorical cat was released at all, it was released in the form of the admissible telephone statements, thus providing no basis for the exclusion of any subsequent statements. *Commonwealth v. Amazeen*, 375 Mass. 73, 79 (1978).

ran's questioning. Cf. *Commonwealth* v. *Mahnke*, 368 Mass. 662, 685-686 (1975), cert. denied, 425 U.S. 959 (1976). Nor can it be said that the defendant's brother was "acting as an agent of the police pursuant to a scheme to elicit statements from the defendant by coercion or guile." *Commonwealth* v. *Mahnke, supra* at 677. Instead, the motion judge correctly found that the defendant and his brother were engaged in a free, voluntary, and separate family conversation uninfluenced by O'Halloran's presence or by anything said or done by him. See *Commonwealth* v. *Haas*, 373 Mass. 545, 554 (1977); *Commonwealth* v. *Watkins*, 375 Mass. 472, 480 (1978).

3. Prior to trial, the defendant filed several motions relating to a claim of prosecutorial misconduct by use of the subpoena power to interview witnesses. The defendant now alleges that the motion judge erred in denying his motions to dismiss and suppress on these grounds. We find that dismissal of the indictments and suppression of evidence were not warranted and that the motion judge granted the appropriate relief.

The defendant moved to dismiss the indictments on the ground of prosecutorial misconduct in that James Smallwood was subpoenaed by the government for interview on a day on which the case was not before the court. See G. L. c. 277, § 68.[3] We emphatically disapprove of this practice. Nevertheless, we conclude that the judge properly denied the motion here. There was no prejudice because James Smallwood refused to answer any questions and thus the Commonwealth obtained no information through this use of the subpoena power. Therefore, we find the judge's statement that preparation for trial was not a proper use of

---

[3] Supreme Judicial Court Rule 3:22A, Standards Relating to the Prosecution Function, PF 3 (c), 377 Mass. 924 (effective March 1, 1979), was not in effect at the time in question. The text of that rule is as follows: "It is unprofessional conduct for a prosecutor to secure the attendance of persons for interviews by use of any communication which has the appearance or color of a subpoena or similar judicial process unless he is authorized by law to do so."

the subpoena, along with his order to terminate this practice, to be a sufficient response to the defendant's motion.

The defendant also moved to dismiss the indictment on the grounds that Kathleen Suida was subpoenaed to appear on a nontrial day and that she did report and answer questions asked by the prosecutor. Moreover, the defendant moved to suppress the responses that Suida gave during this interview. In support of these motions the defendant filed an affidavit of defense investigator Stephen Goodhue indicating that Kathleen Suida had told him that she was subpoenaed to report on a nontrial day and that she did so report and respond to questioning by the prosecutor. This affidavit was clearly hearsay, however, and the judge was justified in finding that it was not sufficient to fulfil the verification requirement of Rules 9 and 61 of the Superior Court (1974). See also Mass. R. Crim. P. 13 (a)(2), 378 Mass. 871 (effective July 1, 1979) (affidavit in support of pretrial motion must be signed by a person with personal knowledge of the factual basis of the motion). Nevertheless, the judge condemned this prosecutorial practice and ordered that it cease. He also determined that the defendant was entitled to know of all potential witnesses whom the prosecution had subpoenaed in this way before such witnesses took the stand. Finally, he suggested that the defendant might bring out on cross-examination of the witness Suida anything regarding the interview in question.

We find the judge's response to be sufficient. There was no prejudice to the defendant occasioned by the conduct of the prosecutor because the existence of the subpoena and the interview, as well as the statements Suida made, were revealed to the defendant "sufficiently in advance of trial to permit investigation." *Commonwealth* v. *Hanger*, 377 Mass. 503, 509 (1979). Therefore, the defense cannot be said to have been "materially hurt in its preparation." *Commonwealth* v. *Gilbert*, 377 Mass. 887, 895 (1979).

The defendant argues that prejudice arose when the trial judge limited the defendant's cross-examination of Suida concerning the prosecution's misuse of the subpoena. Suida

was asked if she thought she "had to talk to Mr. Codinha" (the assistant district attorney). She replied in the affirmative and the assistant district attorney objected. The judge sustained the objection and the answer was struck at the request of the assistant district attorney.

We hold that this ruling fell within the limits of the judge's discretion. The judge had already permitted the witness to testify that she thought she was coming to court and that she would "get arrested" if she did not answer the summons. Thus the judge's ruling "did not totally exclude cross-examination [about the witness's state of mind in responding to the summons], but only limited additional questions on that subject once it had already been raised and explored to some extent before the jury." *Commonwealth* v. *Watson,* 377 Mass. 814, 837 (1979). Therefore we find no unfair impairment of the defendant's right of cross-examination. *Davis* v. *Alaska,* 415 U.S. 308, 316 (1974). *Commonwealth* v. *Dougan,* 377 Mass. 303, 310 (1979).

4. The defendant claims that the trial judge erred in denying each of his two motions for mistrial based on the prosecutor's alleged introduction of evidence that the defendant had participated in a crime not charged. We do not agree.

The defendant first moved for mistrial after Detective O'Halloran testified that he heard the defendant tell his brother "that Boo Boo [William Florentino] was the one that asked him to go out that night earlier when he had been drinking, and that Boo Boo had a couple of places set up and that he used a gun in Lynn in a liquor store." At a bench conference, the judge had the testimony reread and concluded that it did not implicate the defendant in the Lynn incident. We agree. All that could logically and naturally be inferred from the statement was that Boo Boo had used a gun in a liquor store in Lynn; there was nothing in this testimony which amounted to a "'plain' implication that the defendant had committed a prior crime." *Commonwealth* v. *Watkins,* 375 Mass. 472, 491 (1978).

Furthermore, the judge proceeded, at the behest of the defendant, to give curative instructions following this testi-

mony. The judge promptly gave the appropriate instructions in the following terms: "[T]o the extent you have heard any testimony, and your recollection of this testimony is . . . solely and exclusively your province, but to the extent you heard any to the effect that this defendant may have been involved in the commission of a crime not charged, having nothing to do with this specific charge, you are not to consider that as any evidence of guilt of this defendant as to the crimes that are charged in this case."

The most instructive case on the efficacy of curative instructions following evidence of extraneous crimes is *Commonwealth* v. *Clifford*, 374 Mass. 293, 297-299 (1978). In that case we held that the harmful effects of a witness's improper allusion to the defendant's involvement in a robbery were offset by the judge's careful warning to the jury.[4] We find likewise that in the instant case if there were any improper inferences raised by O'Halloran's testimony, they were offset by the curative instructions.

The defendant moved a second time for mistrial during the cross-examination of James Smallwood. In the course of a series of questions concerning admissions the defendant allegedly had made to James, the prosecuting attorney asked, "Do you recall him [the defendant] saying 'Boo Boo used the gun in Lynn?'" James responded, "No, nothing like that," at which point the defendant objected and moved for mistrial.

We find that the judge properly denied this motion. First, the fact that Boo Boo used a gun in Lynn (or even that the defendant was aware of this) does little to imply that the defendant was involved in the Lynn incident. Moreover,

---

[4] The judge cautioned the jury as follows: "Now Mr. Foreman and ladies and gentlemen of the jury, I'm going to ask you to completely disregard the last statement that was made by the witness. It was made inadvertently on her part, but nevertheless, I want you to completely disregard that. Put it right out of your minds. It has absolutely nothing to do with this case." *Commonwealth* v. *Clifford*, 374 Mass. 293, 298 n.2 (1978).

curative instructions were immediately given by the judge.[5] Finally, it should be noted that the judge also properly charged the jury, at the close of the case, that when a witness responds in the negative to a question containing alleged facts, neither the question nor the facts are in evidence, and both are to be ignored by the jury. See *Commonwealth* v. *Ransom,* 358 Mass. 580, 586-587 (1971); *Commonwealth* v. *Oakes,* 151 Mass. 59, 60 (1890); *Commonwealth* v. *White,* 2 Mass. App. Ct. 258, 263-264 (1974), *S.C.,* 367 Mass. 280 (1975). We do "not assume that jurors will slight strong and precise instructions of the trial judge to disregard the matters which have been withdrawn from their consideration." *Commonwealth* v. *Clifford,* 374 Mass. 293, 298 (1978), quoting from *Commonwealth* v. *Gordon,* 356 Mass. 598, 604 (1970). *Commonwealth* v. *Jones,* 373 Mass. 423, 426 (1977).

5. The defendant argues that his Fifth Amendment rights were violated by the prosecuting attorney's improper reference to the defendant's failure to testify at the trial. During his closing argument the prosecutor made the following statement: "Linda Royce was the individual who supposedly was in the apartment with the defendant Smallwood. And you heard testimony that nobody knows her address. Nobody knows where she can be reached. And the only people who have that address are uniquely within the purview of the defendant. What, I submit, could she have told you about that night? . . . Did you hear testimony from the brother: 'What is the address?' 'I don't know.' Did you hear testimony from the brother James Smallwood, 'I don't know but I could find the street again.' Did you hear testimony relating to any further comments on that?" At the close of the argument the defendant moved for a mistrial based upon these remarks. We conclude that this motion was properly denied.

---

[5] The judge instructed the jury "not to consider any information contained in either a question or an answer dealing with an alleged incident in some other place, Lynn, or what have you, supposedly being an alleged crime having nothing to do with the matters under consideration."

Although we conclude that these remarks were "reasonably susceptible of being interpreted as a comment on [the defendant's] failure to take the stand" and that as such they were "improper," *Commonwealth* v. *Gouveia*, 371 Mass. 566, 571 (1976); *Commonwealth* v. *Domanski*, 332 Mass. 66, 69 (1954), we conclude that the denial of a mistrial was not reversible error. "Denial of a mistrial and reliance on curative instructions may be proper, in the judge's discretion, even in a case of clearly improper argument by a prosecutor." *Commonwealth* v. *Gouveia*, *supra* at 572. *Commonwealth* v. *Cabot*, 241 Mass. 131, 151 (1922). *Commonwealth* v. *Burnett*, 371 Mass. 13, 19 (1976).

In the instant case, the improper implication was not even particularly clear. The point the prosecutor was making when he said that the only people who knew where Royce lived were "uniquely within the purview of the defendant" apparently was that the defendant's brother knew where to locate Royce. This interpretation was strengthened by the prosecutor's subsequent specific reference to James and his testimony concerning the question of where Royce lived. The prosecutor's strategy apparently was to create the inference that James was reluctant to help locate Royce because she had knowledge of something incriminating to the defendant.[6] Any intimation that the defendant himself knew something about Royce and failed to disclose it was highly indirect at best. See *United States* v. *Armedo-Sarmiento*, 545 F.2d 785, 793 (2d Cir. 1976), cert. denied, 430 U.S. 917 (1977) ("unless a prosecutor's comments are of such a nature that a jury would naturally and necessarily construe them to be directed to the failure of the defendant to testify, they are not prejudicially unfair"); *Commonwealth* v. *Storey*, 378 Mass. 312, 323-324 (1979) ("[H]ave you heard word one from the defendant as to what took place down at the police station?" characterized as not so

---

[6] No argument has been made to the effect that these remarks might be construed as an improper comment on the failure of the defense to call Royce as a witness, and therefore we do not address that question.

much comment on failure to testify as comment on general weakness of defense).

The judge gave complete and emphatic instructions to the jury to the effect that the defendant need not come forward with any witnesses or evidence and that no inference unfavorable to the defendant could be drawn by reason of his failure to testify. In light of the obscure nature of the prosecutor's alleged allusion to the defendant's failure to testify, we conclude that the judge did not abuse his discretion in relying on the instructions to preclude any potential prejudice.

Since there was no error, we affirm the judgments. Furthermore, upon consideration of the law and the evidence, we find no reason to exercise our power under G. L. c. 278, § 33E, to grant the defendant any other relief.

*Judgments affirmed.*